**Barcia v. Fenlon**

C.P. of Monroe County, no. 5067 CV 2010.

*John J. Miravich,* for plaintiff.

*Todd Weitzmann and Joseph S. Wiesmeth,* for defendants.

MARK, *J.*, January 5, 2011—

OPINION IN SUPPORT OF ORDER PURSUANT TO Pa.R.A.P. 1925(a)

Plaintiff has appealed, or has attempted to appeal, our order dated September 29, and entered September 30, 2010, that denied his motion for post trial relief. After the appeal was filed, we issued an order directing plaintiff to file a statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). Plaintiff complied. We now file this opinion pursuant to Pa.R.A.P. 1925(a).

For the reasons that follow, we believe that plaintiff's appeal is procedurally defective, and therefore should be dismissed or quashed. In the alternative, we believe that the substantive order[1] we issued in this equity action should be affirmed because our decision was supported by the facts, the law, and the equities of this case, and further, properly answered the narrow, stipulated issue the parties asked us to decide.

Viewed in isolation, this case stems from a special membership meeting of the Winona Lakes Property Owners Association, Inc. (the "association") called for the purpose of voting on the removal of some or all of the members of the association's board of directors (the "board" or "board of directors"). Viewed in full context, however, this case has its genesis in and is part of an on-going dispute between the association's current minority faction, with whom plaintiff is aligned, and the current majority faction, with whom the individual defendants are aligned — a fact pattern that is unfortunately all-too-familiar in the affairs of homeowner associations. A brief

---

1. The operative order in this case was entered on August 5, 2010.

historical summary of the disputes between the parties is necessary to a full understanding of this case and our decision.

The feud has generated substantial personal animosity between the competing factions in general and between board members in particular. Disputes have risen to the level where physical altercations, necessitating police involvement, have erupted during association meetings and, as a result, constables are now present during meetings to maintain order. (See N.T., 6/8/10, 4-5 and 31-34, and Joint Exhibit 7, p. 4; N.T., 9/29/10, 21-29; and Appendices A and B)

In addition, the competing factions have taken turns attempting to use corporate and legal maneuvering to unseat directors, amend the procedures by which directors may be removed, or both. These tactics have led to the filing in this court of at least three separate but related equity actions, including this case, that were decided in 2010.

Initially, on December 24, 2009, plaintiff filed an action in equity (the "competing amendment case") seeking to preliminarily and permanently enjoin the association from submitting to its members competing, proposed by-law amendments, both of which pertained to the removal of directors, in a manner that plaintiff believed was contrary to the association's by-laws and Pennsylvania law. Plaintiff also sought an interpretation of the proper procedures for amendment of the by-laws. Five of the six majority directors who are defendants in this case were named as defendants in the competing amendment case.

At the preliminary injunction hearing, an agreement was reached that resolved all issues except the interpretation

issue. On May 27, 2010, we issued an order confirming the amendment procedure set forth in the by-laws and directing that the amendment proposed by plaintiff be mailed to members in accordance with the established procedure. A copy of that order is attached as Appendix A. Our ruling was issued without prejudice to the right of the association to mail its own amendment or the right of either faction to solicit support for their respective proposals.

Next, while the competing amendment case was being litigated, a minority director, Daniel D'Arco, was removed from office by a vote of the majority faction on the board. As a result, Mr. D'Arco filed an equity action seeking to preliminary and permanently enjoin the association and other directors from removing him from office. All six of the majority directors who are defendants in this case were named as defendants in Mr. D'Arco's suit. On May 13, 2010, this court, through the Honorable Arthur L. Zulick, issued an opinion and order preliminarily enjoining the association and the majority directors from removing Mr. D'Arco from the board. A copy of Judge Zulick's opinion is attached as Appendix B.

On June 2, 2010, shortly after Judge Zulick issued his opinion and while follow-up issues were brewing in the competing amendment case, plaintiff commenced this equity action — the third in the series — seeking an order preliminarily and permanently enjoining the individual defendants from acting as members of the association's board of directors. Plaintiff's requests for injunctive relief were based on his belief that, during a special membership meeting held on May 16, 2010, the individual defendants were voted out of office.

On June 8, 2010, the date scheduled for a preliminary injunction hearing, plaintiff, most if not all of the individual defendants, the attorneys for all parties, and what seemed to be a large number of association members appeared and entered the courtroom. Before the hearing convened, the attorneys asked to speak with the undersigned. During the discussion, the attorneys requested that they be permitted to present a stipulation of facts on the record, but in chambers. The request was made for two reasons. First, counsel represented that the disputes between the competing factions had escalated to the point where a physical altercation, requiring police response, had occurred. Counsel wanted to calm the situation and prevent future eruptions by avoiding a contested hearing in the courtroom while emotions were still high. (See N.T., 6/8/10, 4-5 and 31-32; N.T., 9/29/10, 21-29)[2] Second, the attorneys agreed that a full hearing was not necessary since they had discussed and largely reached agreement on a stipulated set of facts and a limited legal issue that could be decided based on the stipulation and briefs. Counsel represented that they had been authorized to present the stipulation in the manner they requested. We accepted counsel's representations, granted their request, and allowed the attorneys to present their stipulation in chambers, but on the record.

The entire stipulation was recorded verbatim. Counsel confirmed, on the record, that they had been authorized by

---

2. Later, during the hearing on plaintiff's post-trial motions, the attorneys representing plaintiff for some reason tried to downplay and minimize the concerns expressed when all counsel made the unusual request to present an on-record stipulation in chambers in lieu of a hearing. (N.T., 9/29/10,24-26) Counsel for defendants, on the other hand, had a different recollection (*Id.* at 27-28) - a recollection that comports with the history recited in the text of this opinion and the exhibits presented in this case. (See Joint Exhibit 7, p.4, and Appendix B)

their clients to present the stipulation. (N.T., 6/18/10, 5) Counsel then recited the stipulation which consisted of: a) the submission, and in some instances the annotation, of ten (10) joint exhibits; b) defendants' stipulation, in whole or in part, to the averments of designated paragraphs in plaintiff's complaint; and c) agreements regarding the conduct of the special meeting, the votes cast at the meeting, the manner in which the association has historically conducted business, and related matters. *Id.* at 3-34.

Based on the stipulated record, the relevant facts may be summarized as follows:

The association is a Pennsylvania non-profit corporation. It is the property owners association for the subdivision known as Winona Lakes, a planned residential community located in Middle Smithfield Township, Monroe County, Pennsylvania. The individual defendants are duly elected members of the association's Board of Directors. Plaintiff is a member in good standing of the association. As discussed, plaintiff is aligned with the minority faction of the Association and the board; the individual defendants are part of the majority faction.

In early 2010, plaintiff caused a "request for special meeting of the owner-members in good standing" to be prepared and circulated for signature. The request read as follows:

We, the following owner-members in good standing of the Winona Lakes Property Owners Association, hereby request that a special meeting of the owner-members be scheduled pursuant to Section 6.3 of the By-Laws of the association for the purpose of voting to remove

members of the board of directors *in accordance with* [Section 5303(f) of the Uniform Planned Community Act,] *68 Pa.C.S.A. Section 5303(f) Removal of members.* (Joint Exhibit 1) (brackets and emphasis added).

Plaintiff obtained the requisite number of signatures to call for the special meeting. Accordingly, the meeting was called for the requested purpose. Notice of the meeting was mailed to association members in good standing. (N.T., 6/8/10, 5-6 and 9, and Joint Exhibit 6)

Prior to the meeting, the majority directors sent information and requests pertaining to the meeting to all association members through articles in the community newspaper and a separate mailing from the board. In their communications, the majority directors: a) reminded association members about the special meeting; b) articulated their belief as to what the minority faction was attempting to accomplish by calling the meeting; c) requested that members attend the meeting; and d) sought proxy votes from members who could not attend in person. *Id.* at 7-10, Joint Exhibit 4, and Joint Exhibit 7, pp. 1 and 12. Proxy votes were actively and openly solicited. The majority directors asked members who could not attend to give their proxies to Stephen Foster, a member of the association's finance committee, and provided information about Mr. Foster. *Id.* Neither plaintiff nor any other association member objected to proxy voting while proxy votes were being solicited.

Ultimately, more than 200 association members gave Mr. Foster their proxy and, at the special meeting, Mr. Foster cast 219 votes as an agent for these members. (N.T., 6/8/10, 20-21) Mr. Foster was not the only person to request, submit, or attempt to submit proxy votes. On

May 15, 2010, the day before the special meeting, the association received from plaintiff a certificate of proxy for 37 proxy votes. *Id.* at 10 and Joint Exhibit 8. Additionally, plaintiff's wife, also a member of the minority faction, solicited and submitted proxies. However, her proxy votes were rejected due to defects in the proxy documents. *Id.* at 10-11 and 26-27 and Joint Exhibit 8. (N.T., 9/29/10, 11-12) Daniel D'Arco, the director who filed the case heard by Judge Zulick and a person affiliated with the minority faction, also submitted proxies. *Id.* at 10-11 and Joint Exhibit 9. Like the initial petition calling for the special meeting, the proxy certificates submitted by plaintiff's wife and Mr. D'Arco referenced the Uniform Planned Community Act (the "act"). Specifically, the certificates cited Section 5310 of the act, 68 Pa. C.S.A. Section 5310, pertaining to proxy votes. (Joint Exhibits 9 and 10)

The special meeting was held, as scheduled and noticed, on May 16, 2010. Immediately prior to, or at the beginning of, the meeting, plaintiff's attorney contacted counsel for the association and objected to the use of proxies. (N.T., 6/8/10,17; N.T., 9/29/10, 14-15) The objection was overruled. As indicated, no objections had previously been lodged.

At the meeting, a total of 394 qualified votes were cast. Of those, 247 votes were cast by proxy, and 147 votes were cast in person by members who appeared at the meeting. An additional six members were present but chose to cast their votes by proxy. (N.T., 6/8/10, at 18-21 and Joint Exhibits 2 and 3) The parties stipulated that, if the proxy votes are counted, no directors were removed. *Id.* at 20.

The parties agreed that the special meeting was the first special membership meeting ever called to address

the removal of a director. It was also the first time that the association used proxy voting. As to proxy voting and the provisions of the act, the Pennsylvania Nonprofit Corporation Law (the "NCL"), 15 Pa.C.S.A. Section 5101 et. seq., and the association's by-laws, the parties agreed that the association had conducted business in accordance with the act, but had never formally adopted, through its by-laws, any provision of the act, including the provision allowing proxy voting, that was not legislatively made retroactive. The parties also agreed that the association's by-laws do not, as permitted under the NCL, specifically provide for proxy voting. (N.T., 6/8/10, 16 and 22-26)

Finally, as part of the stipulation, the parties agreed that the sole, limited issue for this court to decide was whether any member of the association's board of directors was removed as a result of the vote of the membership on May 16, 2010. (N.T., 6/8/10, 5. See also N.T., 7/23/10, 8; N.T., 9/29/10, 17; plaintiff's brief in support of motion for permanent injunction, p.2; plaintiff's brief in support of post trial motions, p.2)

On July 23, 2010, following transcription of the stipulation and review of the briefs filed by all parties, we convened a hearing to announce our decision. During the hearing, we ruled that no member of the board was removed as a result of the vote taken at the special meeting. We then summarized our analysis of the case and the rationale for our decision (N.T., 7/23/10, 2-12)[3] A written order setting

3. The undersigned has routinely used the procedure of announcing decisions in appropriate cases, especially where, as here, a prompt decision is prudent. Typically, an oral decision is given that is more comprehensive than the announcement in this case. However, as the parties were informed and observed for themselves, a criminal trial unexpectedly ran over into the day of the announcement hearing and, during the time scheduled for the announcement itself, the jury came

forth our ruling was entered on August 5, 2010.

Subsequently, plaintiff filed post trial motions which were briefed by all parties. A hearing on plaintiff's motion was convened on September 29, 2010. During the hearing, the attorneys presented oral argument. Thereafter, we reiterated and supplemented the reasons previously given for our ruling and indicated that our decision would stand. An order denying plaintiff's motion for post trial relief was entered on September 30, 2010.

On October 29, 2010, plaintiff filed this appeal. In his notice of appeal, plaintiff indicated that he was appealing from the September 30, 2010 order denying his post trial motions. To date, no party has entered judgment on the August 5, 2010 order that decided the stipulated issue in this case and dismissed plaintiff's pleadings.

Given this history, we believe that plaintiff's appeal is procedurally defective. As noted, judgment has not been entered on the verdict. Thus, the appeal is, at best, premature. See *Underwood v. Wind*, 954 A.2d 1199 (Pa. Super. 2008); *Harvey v. Rouse Chamberlin, Ltd.*, 901 A.2d 523 (Pa. Super. 2006). Additionally, but along the same lines, an appeal from an order denying a motion for post trial relief is not proper. An appeal properly lies from the entry of judgment. See *Fanning v. Davne*, 795 A.2d 388 (Pa. Super. 2002). For these reasons, we believe that the appeal is defective and should be dismissed or quashed.

---

back with a question. As a result, the reasoning given on the record was abbreviated. (See N.T., 9/29/10, 14-15) Nonetheless, the basic reasons for the decision were recited. In addition, a more complete rationale was articulated during the subsequent hearing on plaintiff's motion for post-trial relief. (*Id.* at 2-29) The statements of rationale given during both hearings provide the reasons for our decision and are supplemented and amplified in this opinion.

In the alternative, if plaintiff is found to have properly perfected his appeal and preserved issues for appellate review, we believe that the rationale expressed during the announcement hearing and the hearing on plaintiff's motion for post-trial relief is for the most part sufficient to address any issues that plaintiff is deemed to have preserved for appellate review, and further, to show that our decision was supported by the facts and equities of this case. (N.T., 7/23/10, 2-12; N.T., 9/29/10, 2-29) In supplementation and amplification of our on-record statements, we offer the following:

From the beginning, plaintiff has maintained that resolution of this matter requires only the academic exercise of statutory interpretation. He does so through a syllogistic argument. As his first premise, plaintiff asserts that, under applicable law, a property owners association may use proxy voting only if it has adopted through its by-laws either the proxy voting provision of the act or another proxy voting procedure as permitted under the NPCL. As his second premise, plaintiff asserts that the association's by-laws did not specifically allow proxy voting. Therefore, plaintiff concludes, the association was not permitted to use proxy voting and the proxy votes cast during the special meeting must be disallowed. According to plaintiff, if proxy votes are not counted, at least five of the six individual defendants were removed from office and, as a result, we should have ruled that at least five directors were voted off the board. This argument ignores both the limited issue which the parties asked us to decide and the facts, circumstances, history, and equities of this case.

Initially, we did not, as plaintiff contends, "allow" proxy voting. The association, prompted in part by plaintiff's

reference to the act in the request for special meeting he circulated, instituted the proxy voting procedure used in this case. It did so without any objection from plaintiff until the eleventh or twelfth hour. Similarly, we did not, as plaintiff implies, determine that the association was statutorily authorized, now or in the future, to use a proxy voting procedure. Rather, in answering the narrow question the parties asked us to answer, we simply found that, under the specific facts and circumstances of this equity case, it would have been completely inequitable and unjust to have disallowed the proxy votes or ruled that any directors were removed from office as a result of the vote taken at the special meeting.

When plaintiff filed this action, he invoked the equity jurisdiction of this court. A corollary, plaintiff subjected himself to equitable principles, defenses, and analyses, as well as the equitable resolution of the case. Neither plaintiff's actions nor the removal of directors that he sought were equitable under the facts presented.

The facts are clear from the record. Plaintiff circulated a request for special meeting that specifically referenced the act. While plaintiff is correct that the association did not adopt the proxy voting procedures of the act, the act nonetheless allows proxy voting. After the special meeting was called, the board actively and openly solicited proxy votes. The majority directors were not the only persons soliciting proxies. As indicted, plaintiff presented a certificate of proxy for 37 proxy votes. In addition, plaintiff's wife and Mr. D'Arco, both of whom were obviously aligned with plaintiff and the minority faction, solicited and actually submitted proxy votes. In fact, the certificates they submitted specifically referenced the proxy voting provision of the act. While proxies were

being solicited, neither plaintiff nor any other member of the association lodged an objection to the proxy voting procedure. It was not until immediately before or at the beginning of the meeting that plaintiff, through his attorney, objected to the use of proxies. Of course, by that time: a) almost 250 association members in good standing had given proxies that they reasonably believed would be effective; b) plaintiff had the opportunity to see which members were in attendance and had undoubtedly made his own assessment as to the likely outcome of the vote if proxies were disallowed; and c) it was too late for members who had given proxies to attend the meeting in person. Along similar lines, this action was filed only after the vote had been tallied and plaintiff (and the minority faction) had calculated what the outcome might be if proxy votes were not counted.

In short, plaintiff's call for the meeting referenced a statute that allows proxy voting. While the association had not formally adopted a proxy voting by-law, proxy voting is routinely used in corporate affairs and is permissible under both the NCL and the act. Many members of the association gave proxies which they believed valid. Plaintiff and others who are aligned with him participated in the proxy process. His wife and Mr. D'Arco submitted proxies specifically referencing the provision of the act that allows proxy voting. Plaintiff did not lodge a timely, good faith objection to the use of proxies; rather, he waited until commencement of the meeting when asserting an objection would apparently lead to the result that he sought to achieve. Had plaintiff truly wanted to raise a principled or legal objection to proxy voting, and preserve a legitimate equity-based challenge to the result of the meeting, he should have refrained from prompting and participating in

the proxy process and lodged a timely objection. He did not. Instead, he continued the gamesmanship, the corporate and legal maneuvering, and the attempts at manipulation that both factions have unfortunately exhibited throughout their feud. Equity does not and should not countenance this type of gamesmanship. Equity jurisdiction exists to promote fairness, not to allow a litigant, or a faction, to gain advantage.

Additionally, disallowing the proxy votes and granting the relief requested by plaintiff would have adversely impacted not only the individual director defendants, but also, many other members of the association. Disallowing the proxy votes would have effectively disenfranchised the almost 250 association members (including minority faction members) who gave their proxies under the reasonable good faith belief that votes cast using the proxies would be counted. Such a ruling would also have nullified almost sixty-three percent (63%) of the votes cast and, if plaintiff's assessment of the overall vote count was accepted, would have resulted in the removal of at least five directors duly elected by the membership at large based on the vote of 147 members who constituted only thirty-seven percent (37%) of the qualified votes cast at the meeting.

Under these circumstances, we found that, even though the association had not adopted a specific proxy voting by-law, it would have been inequitable and unjust to have disallowed the proxy votes and ruled that any member of the board had been voted out of office. We stand firmly by our decision.

Alternatively, but for the same reasons, even if all proxy votes were disallowed based on the absence of a by-law

authorizing proxy voting, the proper equitable remedy would not have been to order removal of the individual directors, but rather, to nullify the vote in its entirety and order a re-vote at another meeting scheduled with notice to all members of the association that they must appear to vote. That remedy would have promoted fairness. It would not, however, have resulted in a finding that any member of the board had been removed from office which, as noted, was the only issue this court was asked to decide.

As he did in the proceedings before this court, plaintiff raises an alternative argument on appeal. Specifically, plaintiff contends that the 219 proxy votes cast by Mr. Foster should not have been counted because Section 5.3 of the association's by-laws contains a provision that prohibits any single member from casting more than ten votes. (Joint Exhibit 5, p.4) This contention may be disposed of quickly.

Under Section 5 of the association's by-laws, an owner-member is entitled to one vote for each lot owned. The specific by-law referenced by plaintiff provides that "[i]n any event, no owner...may cast more than ten (10) votes regardless of the number of lots owned." *Id.* By its terms, this provision limits the number of votes an individual member may cast based on lot ownership. However, the provision does not limit the actions that an agent may take on behalf of a principal.

Black's Law Dictionary defines the term "proxy" as follows:

A person who is substituted or deputed by another to represent him and act for him, particularly in some meeting or public body. An agent representing and

acting for principal. Also the instrument containing the appointment of such person....

Written authorization given by one person to another so that the second person can act for the first, such as that given by a share holder to someone else to represent him and his shares at a share holder's meeting. Black's Law Dictionary, p 1103-04 (5th ed.) (West 1979).

In this case, as counsel for plaintiff candidly acknowledged, Mr. Foster did not cast 219 votes for himself; rather, he cast 219 proxy votes "as an agent for" other members. (N.T., 6/8/10, 20-21). Since Mr. Foster was simply acting as an agent for other association members (in the same way that Mr. D'Arco acted and as Mrs. Barcia attempted to act), and there was no allegation that Mr. Foster voted more than ten times for himself or any member whose proxy he held, there was no violation of the by-laws.

For these reasons, we believe that plaintiff's appeal should be dismissed or quashed. In the alternative, for the reasons expressed during the announcement hearing and the hearing on plaintiff's motion for post trial relief, as well as those stated in this opinion, we believe that our decision should be affirmed.